In re Jay A. McMAHON, Debtor.

Peggy FERNANDEZ, Plaintiff,

v.

Jay A. McMAHON, Defendant.

Bankruptcy No. 93–5804–8P7.
Adv. No. 93–623.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

April 6, 1995.

John Kassos, St. Petersburg, FL, for debtor.

Traci K. Strickland, Trustee, St. Petersburg, FL.

Marla J. Rosin, Donald G. Greiwe, Co–Counsel, Tampa, FL, for plaintiff.

Charles Medearis, St. Petersburg, FL, for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case and the matter under consideration is a Complaint to Determine Dischargeability of Debt filed by the Plaintiff, Peggy Fernandez (Fernandez). In her Complaint, Fernandez asserts that the debt owed to her by Jay A. McMahon (Debtor) is nondischargeable under § 523(a)(6) of the Bankruptcy Code because according to her, the debt owed to her by the Debtor is based on a willful and malicious injury inflicted on her by the Debtor. The debt is represented by a Final Judgment entered against the Debtor and in favor of Fernandez by the Circuit Court for Pinellas County, Florida, on

February 1, 1993, in the total amount of $384,860.25. On March 24, 1994, the Plaintiff filed her Motion for Summary Judgment which was heard in due course and by an Order entered on September 2, 1994 the Motion was denied and the Plaintiff's claim was set for trial, at which time the Court heard testimony of witness and considered the evidence and the entire record and now finds and concludes as follows:

Prior to 1992, the Debtor was an oral maxillofacial surgeon licensed to practice in the State of Florida. In the years immediately prior to 1992, the Debtor concentrated his practice in the placement of dental implants, a procedure where the implant material is inserted into a patient's jawbone. If the patient has sufficient bone structure then the implant material fuses with the bone structure by natural processes in order to serve as a foundation for permanent dentures or other teeth.

On April 29, 1988, Fernandez consulted with the Debtor in his office regarding the procedure and the terms under which Fernandez could receive a dental implant. It is without dispute that the Debtor and Fernandez discussed the general nature of the procedure, as well as the fact that the Debtor would perform the procedure at a reduced cost if she agreed that the procedure would be videotaped. Apparently, the Debtor had an arrangement with Stryker Surgical Corp. (Stryker), the manufacturer of the Stryker Precision Implant System, pursuant to which the Debtor would receive certain equipment in exchange for allowing the implant procedure to be videotaped for use by Stryker as an instructional tool.

The Debtor performed a preliminary evaluation of Fernandez in his office during her initial visit and ordered a CT Scan to be done at Humana Hospital. The evidence is in dispute as to whether the Debtor advised Fernandez that she would receive a general or only a local anesthetic during the surgery and also as to whether the Debtor advised her that her bone structure was inadequate and would need to be augmented. In any event, Fernandez did in fact undergo the CT Scan at Humana Hospital and the results were interpreted by a radiologist and sent to the Debtor. The Debtor's records concerning his evaluation of Fernandez are minimal at best. The fact of the matter is that his Medical Evaluation and Diagnosis Forms were left completely blank. (Pl's Exh. 8). Further, apart from notations concerning his fee for the surgery, his written treatment Plan reflects only that the Debtor proposed to install 6″ root form implants, if possible. (Pl's Exh. 8).

The Debtor performed the dental implant procedure on Fernandez on May 18, 1988 in the Debtor's office. The procedure extended for more than 9 hours, from approximately 8:00 a.m. until after 5:00 p.m. During the entire procedure Fernandez was awake and aware of her surroundings. No record was maintained as to the amount or effect of the local anesthetic that was administered by an employee of the Debtor and not by a medical doctor specializing in administering anesthesia. The procedure was videotaped, at least in part, so that a camera man and his equipment was in the operating room during the procedure. Also present in the operating room was a nurse and other surgical staff. It is undisputed that one of the implants failed to fuse in the jaw bone, became loose and migrated into Fernandez' sinus cavity during the procedure, and that the Debtor retrieved the implant with orthopaedic instruments. The procedure to retrieve the implant from the sinus cavity may have taken as long as 2½ hours. After the implant was recovered, the Debtor did not abandon the procedure, but instead resumed the procedure and installed the implants as planned. It appears that Fernandez was in great pain during the entire procedure and repeatedly cried for relief but was rebuffed by the Debtor who told her that he would cut her tongue off if she did not keep quiet. The Debtor claims that the threat was not seriously intended and it was said in jest.

The evidence is in conflict as to other unusual incidents which may have occurred during the course of the surgery. For instance there was testimony, albeit contradictory, as to whether or not the operating room technician who administered a local anesthetic to Fernandez was qualified to administer injections. In addition, there was evidence,

although contradicted, that during the procedure, the Debtor took a one-hour lunch break and had pizza with the staff in the adjoining room while Fernandez remained on the operating table; that during the entire time she was restrained or severely restricted in her movements; that her mouth was held open during the entire procedure by a retractor without giving her an opportunity to relax her muscles; that the Debtor sought the advice of the representative of Stryker about the proper way to place the lower implants. There was also contradictory testimony as to whether the Debtor used an unsterile instrument to recover the lost implant from the sinus cavity after the instrument had been dropped on the floor by this same technician. According to the technician, the Debtor instructed her only to wash the instrument with alcohol after it was retrieved from the floor and before he used it again.

Be as it may, the Debtor installed a total of 10 implants in Fernandez' mouth instead of six as originally stated in the Treatment Plan. The Debtor placed eight implants in her upper jaw, and two blade implants in her lower jaw. According to post-operative X-rays, all of the implants appeared to be properly aligned at the completion of the procedure, with no indication of any further migration of the implants into Fernandez' sinus cavity. All of the implants used in the surgery were designed or manufactured in accordance with the Stryker implant system, a system which has not been approved by the American Dental Association.

Fernandez soon experienced pain and discomfort following the surgery and her family members attempted to contact the Debtor for assistance but received no response. It is without dispute that Fernandez later returned to the Debtor's office on various occasions for heat treatments, intended to alleviate the pain and also appeared for additional filming or photography following the surgery by Stryker. Since the surgery, Fernandez has experienced continued discomfort with pain in her ears, temporomandibular joint ailments and she has been unable to chew properly.

Approximately six weeks after the implant procedure on June 29, 1988, Fernandez consulted with Dr. Anthony Auletta, an oral and maxillofacial surgeon, in order to obtain a second opinion regarding her discomfort and the placement of the implants. A radiograph or X-ray taken of Fernandez' jaws and sinuses revealed that one of the upper left implants became loose and was lying within Fernandez' sinus cavity. Dr. Auletta recommended that the implant be removed from the sinus through a special surgical procedure in order to prevent a potential for chronic sinus infections which might be caused by the implant in the sinus. Although it is unclear, it appears that Fernandez did discuss the migrant implant with the Debtor at some point, and the Debtor suggested that the implant should be left alone and there was no danger if the implant remained in the sinus.

On August 16, 1988, Fernandez returned to Dr. Auletta's office and further X-rays were taken. At that time it was discovered that an upper right implant had also moved and was then in Fernandez' right maxillary sinus. On November 22, 1988, Dr. Auletta surgically retrieved both of the implants from Fernandez' sinus cavities. Ultimately all but one of the implants were removed because they had not properly fused with the Debtor's bone.

Based upon these facts, Fernandez contends that the debt owed to her by the Debtor should be declared to be nondischargeable pursuant to § 523(a)(6) of the Bankruptcy Code. This Section provides that an individual debtor is not discharged from any debt "for willful and malicious injury by the debtor to another entity." Cases construing this Section in the context of medical malpractice actions are generally fact-intensive, and independent research failed to discover any decision by the Eleventh Circuit which is squarely on point. However, it is fundamental that the debt must result from a willful and malicious injury by the debtor in order to be determined to be nondischargeable. As used in this Section, the term "willful" means intentional, and the intent required is the intent to do the act, not the intent to injure the claimant. *In re Britton,* 950 F.2d 602, 605 (9th Cir.1991). In addition, the claimant must also prove "malice," which

means that the debtor had actual knowledge that his conduct would produce the injury, or that the injury was reasonably foreseeable, but that the debtor proceeded in the face of a known risk and that the act was done without just cause or excuse. *Britton,* 950 F.2d at 605; *In re Tanner,* 31 B.R. 338 (Bkrtcy. S.D.Fla.1983). In short, the plaintiff must show that the debtor's conduct amounted to more than mere negligence, or even gross negligence, in order to satisfy the willful and malicious standard. *In re Jaquis,* 131 B.R. 1004, 1009 (Bkrtcy.M.D.Fla.1991). This showing must be made by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In this case, extensive expert testimony was presented regarding the "willful and malicious" elements of § 523(a)(6). The primary focus of this expert testimony centered on the Debtor's failure to recognize that Fernandez was not a suitable candidate for the dental implant surgery. It appears that a qualified implant patient must have a sufficient amount of existing bone structure in the jaw to stabilize the implants, and that the sufficiency of the bone is critical to the success of the procedure. The quantity of the patient's existing bone may be determined in part by X-rays and CT scans, prior to the procedure, and may also be ascertained with greater precision at the time of the procedure. If a patient's bone structure is inadequate, the existing bone may be augmented in some instances by freeze-dried bone or other grafting material.

It is clear from the record that Fernandez had inadequate bone structure in her jaw prior to the surgery to support the implants, and there is ample evidence to conclude that the implants installed by the Debtor migrated into Fernandez' sinus cavities as a result of the inadequate bone. According to the expert witnesses the Debtor failed to follow the appropriate procedure and should have foreseen the resulting injury in at least two primary respects:

(1) First, the Debtor failed to recognize in advance that Fernandez was not a suitable candidate for the implant surgery because of her inadequate bone structure.

(2) Second, after the insufficiency of the bone became apparent during the surgery the Debtor failed to either (1) convert the surgery into a two-step procedure and simply augment the bone in the first phase; or (2) abandon the procedure entirely.

There is evidence that the Debtor did in fact attempt to augment the bone with "freeze-dried" bone or a related substance during the procedure, although he also placed the implants during the same procedure and proceeded with the surgery even after one implant migrated into Fernandez' sinus cavity. According to the expert testimony, the Debtor should either have halted the surgery completely at that point or proceeded only with the augmentation of the bone but not with the simultaneous placement of the implants. Expert testimony also indicated that the Debtor fell below the acceptable standard of medical care as follows:

(1) The Debtor exercised poor judgment in using the Stryker implant system, a system not approved by the American Dental Association.

(2) The length of the procedure was extraordinary.

(3) The Debtor acted improperly to the extent that he used an orthopedic tool that had only been wiped with alcohol, but not sterilized, after having been dropped on the floor.

(4) The Debtor erred in recommending that the implant be left in Fernandez' sinus cavity after it migrated there following the surgery.

As noted earlier, a mere negligence or even a gross negligence by a debtor is insufficient to establish a viable claim to the exception to discharge under § 523(a)(6). Neither is a conduct which otherwise would be tantamount to malpractice, which conduct fell below the prevailing professional standard in the community. See *Fla.Stat.* 766.102(1). However, a conduct of the debtor which falls below the prevailing professional standard of care coupled with a conduct which produced a foreseeable injury and evidenced a conscious disregard of the safety of the procedure undertaken by the Debtor which ultimately caused the injury complained of is clearly sufficient to find that the

Debtor's liability to Fernandez should be excepted from the overall protection of the general bankruptcy discharge pursuant to § 523(a)(6).

A separate final judgment shall be entered in accordance with the foregoing.